IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LARNETTRA RICHARDSON,       )
                            )
            Plaintiff,      )
                            )
      v.                    )       1:05CV378
                            )
AMERICAN UNITED LIFE INSURANCE )
COMPANY; and STEP ONE, INC.,   )
                            )
            Defendants.     )

FINDINGS AND CONCLUSIONS

Beaty, Chief District Judge.

        This case involves a claim for disability benefits brought by Plaintiff Larnettra Richardson

("Plaintiff") against the American United Life Insurance Company ("AUL" or "Defendant")[1]

pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

This case came before the Court for a bench trial on July 10, 2006. The Court has considered

the evidence presented and will make findings of fact and conclusions of law as set out below.

However, the Court must first address Defendant's Motion in Limine [Document #26] to exclude

the testimony of Plaintiff and one of her physicians, Dr. Willard L. McCloud, Jr. ("Dr.

McCloud"). The Court will then make findings of fact and conclusions of law based on the

evidence properly before the Court.

_____

        [1] Plaintiff's suit also initially included claims against her employer, Step One, Inc.,
through whom she obtained the benefit plan. However, all of the claims against Step One, Inc.
were voluntarily dismissed with prejudice on June 13, 2006, and this case proceeded solely against
Defendant AUL.

I.       DEFENDANTS MOTION IN LIMINE

At the bench trial in this case, Defendant filed a Motion in Limine to Exclude Any Testimony [Document #26] by Plaintiff or by Dr. McCloud for two reasons.  First, Defendant contends that any testimony by Plaintiff and by Dr. McCloud should be excluded pursuant to Federal Rule of Civil Procedure 37 because Plaintiff failed to properly identify herself as a potential witness and failed to provide an expert report for Dr. McCloud as required by Federal Rule of Civil Procedure 26.  Second, Defendant contends that because this case is an ERISA case, the Court may not consider any evidence or admit any testimony that was not contained in the "administrative record" compiled by AUL. The Court will address each of these contentions in turn.

A.       Motion to Exclude Pursuant to Rules 37 and 26

Federal Rule of Civil Procedure 26(a)(3) requires that at least 30 days before trial, the parties disclose to one another the identification of any witnesses they intend to call at trial.[2] Defendant contends that Plaintiff failed to identify herself as a witness, and that her testimony should therefore be excluded.  Under Federal Rule of Civil Procedure 37, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness

---

[2] Although Rule 26 also requires this information to be filed with the Court, at the time of the bench trial in this case, Local Rule 40.1 of this Court provided that the pretrial disclosures mandated by Rule 26(a)(3) "shall be served on other parties but should not be filed with the court."  Therefore, the witness lists in the present case were not, and need not have been, filed with the Court.

or information not so disclosed." Fed. R. Civ. P. 37. In determining whether nondisclosure is substantially justified or harmless, the Fourth Circuit has directed courts consider: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." <u>Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.</u>, 318 F.3d 592, 597 (4th Cir. 2003). In the present case, Plaintiff sought to present her own testimony as to what occurred during the benefits claims process, but failed to list herself as a witness in final pretrial disclosures. Her testimony was very important to the issues before the Court, and was not in any way disruptive of the bench trial in this case. Plaintiff's failure was inadvertent and was not in bad faith or in callous disregard of the rules. Even more importantly, the Court notes that there can be no plausible surprise to Defendant in this case, since they have known Plaintiff's identity since the inception of this lawsuit, and there is no surprise that she would be a witness in this matter.[3] In addition, even if Plaintiff had included herself on her witness list 30 days before trial as required by Rule 26(a)(3), Defendant would not have been entitled at that time to take Plaintiff's deposition since discovery had already closed at that point. Thus, any "surprise" was the result of Defendant's own tactical decision not to take Plaintiff's deposition during

---

[3] To the extent Defendant contends that they were "surprised" because Plaintiff's testimony was not part of the "administrative record" in this case, that surprise is based on Defendant's own misconception of the scope of this Court's review in an ERISA case, as discussed in the next section.

discovery in this matter, and was not the result of any failure by Plaintiff. Therefore, the Court concludes that any failure by Plaintiff to list herself as a witness in this case in the pretrial disclosures required by Federal Rule of Civil Procedure 26(a)(3) was harmless. For these reasons, the Court determined at the bench trial in this case that Defendant's Motion in Limine to exclude Plaintiff as a witness pursuant to Federal Rules of Civil Procedure 26 and 37 would be denied.

With respect to the testimony of Dr. McCloud, Plaintiff identified Dr. McCloud to Defendant as an expert witness in this case. Dr. McCloud was one of Plaintiff's treating physicians, and supplied records and reports regarding his treatment of Plaintiff to AUL during the claims process. Although Plaintiff identified Dr. McCloud as an expert witness, Defendant contends that Dr. McCloud must be excluded pursuant to Federal Rule of Civil Procedure 37(c) and 26(a)(2) because Dr. McCloud did not provide a written report containing "a complete statement of all opinions to be expressed and the basis and reasons therefore." Fed. R. Civ. P. 26(a)(2). However, Rule 26(a)(2) only requires such a report with respect to "a witness who is retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2); see also Advisory Committee Notes, 1993 Amendments to Fed. R. Civ. P. 26 ("The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case . . . . A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."); Musser v. Gentiva Health Services, 356 F.3d 751, 756-57 (7th Cir. 2004) (noting that

4

Rule 26 requires that all expert witnesses be identified, but only those retained or specially employed to provide expert testimony need to provide an expert report); see also Indemnity Ins. Co. of North America v. American Eurocopter LLC, 227 F.R.D. 421, 423-24 (M.D.N.C. 2005); Hall v. Sykes, 164 F.R.D. 46, 48-49 (E.D. Va. 1995).

In the present case, Dr. McCloud was not a specially-retained expert, but was instead presented to the Court as Plaintiff's treating physician. He did not testify to any conclusions or opinions beyond his personal treatment of Plaintiff as reflected in his medical records. All of his medical records and reports regarding Plaintiff had been fully provided to AUL during the claims process. Therefore, in these circumstances, no expert report from Dr. McCloud was required under Rule 26(a)(2)(B). In addition, the Court concludes that Dr. McCloud's testimony could not be considered a "surprise," since he was specifically identified as an expert witness in a letter from Plaintiff's counsel to Defendant dated September 19, 2005, as required by Rule 26. Moreover, Dr. McCloud was directly involved in the claims process, and had provided opinions and medical records directly to AUL during that process. Thus, he was clearly identified in Plaintiff's claim file from the beginning of this litigation. Defendant chose not to depose Dr. McCloud at any time during discovery, even after he was identified as an expert witness by Plaintiff, apparently based on Defendant's mistaken determination that Dr. McCloud could not testify unless he provided an expert report. Thus, any decision not to depose Dr. McCloud during discovery was Defendant's own choice, and was not the result of any failure by Plaintiff. In addition, the Court further notes that Dr. McCloud's testimony was important to the matters

5

before the Court and was not disruptive to the bench trial in this case. Therefore, because no expert report was required to be provided by Dr. McCloud under Rule 26(a)(2), and because any other failure to comply with Rule 26(a)(3) was harmless, the Court concluded at the bench trial in this case that Defendant's Motion in Limine to exclude the testimony of Dr. McCloud would be denied.

      B.      Motion to Exclude Evidence Not in the "Administrative Record" Compiled by AUL

As noted above, Defendant in its Motion in Limine also contends that because this case is an ERISA case, the Court may not consider any evidence or admit any testimony that was not contained in the "administrative record" compiled by AUL. However, the parties in this case agree that the relevant plan does not confer discretion upon the plan administrator, and that this case is therefore before the Court for *de novo* review. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). When an ERISA case is before the Court for *de novo* review, the Fourth Circuit has held that court may consider additional evidence not presented to the plan administrator "where the district court finds that additional evidence is necessary for resolution of the benefit claim." Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1026-27 (4th Cir. 1993).

In this regard, the Fourth Circuit held that:

Exceptional circumstances that may warrant an exercise of the court's discretion to allow additional evidence include the following: claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding

6

interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process. . . . This list of factors is not exhaustive but is merely a guide for district courts faced with motions to introduce evidence not presented to the plan administrator. In determining whether to grant such a motion, the district court should address why the evidence proffered was not submitted to the plan administrator. If the administrative procedures do not allow for or permit the introduction of the evidence, then its admission may be warranted. In contrast, if the evidence is cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant mustered for the claim review, then its admission is not necessary. If the court is faced with a complex medical issue on which testimony from experts is necessary for an adequate understanding of the issue and the administrative procedures do not have a mechanism for taking such testimony, allowing such testimony would be appropriate.

Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1026-27 (4th Cir. 1993).[4] Thus, the Fourth Circuit has provided specific guidance regarding what additional evidence may be considered by the Court on *de novo* review in an ERISA case. Therefore, on *de novo* review, it is not appropriate to impose a *per se* rule limiting consideration of any evidence not contained in the "administrative record," and the Court must instead determine whether any additional

_____

[4] To the extent there is a circuit split on this issue, this Court will follow the rule as stated by the Fourth Circuit in Quesinberry. Therefore, the case law cited by Defendant in its Trial Brief from other circuits, particularly the Sixth Circuit and district courts in that circuit, which follow a more restrictive rule on *de novo* review, is not persuasive authority on this issue. Cf. Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1184-85 and n.8 (3d Cir. 1991) (considering and rejecting Sixth Circuit approach, which limits review to the evidence before the plan administrator, and instead adopting approach of the Eleventh Circuit and D.C. Circuit, which like the Fourth Circuit approach, allows consideration of additional evidence on *de novo* review in the discretion of the district court where good cause or sufficient basis exists).

evidence should be considered under the factors articulated by the Fourth Circuit in Quisenberry.

Moreover, the Court further notes that the plan administrator cannot limit the record or the Court's review by "blatantly disregard[ing] an applicant's submissions," and where appropriate, the Court may consider the testimony of the parties and their evidence in determining what evidence was actually before the plan administrator during the claims process. Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456 (7th Cir. 2001).

In applying these standards in the present case, the Court notes first that on the morning of the bench trial in this case, the parties submitted a stipulation agreeing that the Court could properly consider three documents produced by Plaintiff, including a letter Plaintiff sent to AUL during the claims process, in addition to the "administrative record" submitted by AUL. To a large extent, this resolves the disputed issues as to what evidence was before the plan administrator, since the parties agree that Plaintiff's additional documents "can be considered by the Court in the adjudication of this matter." (Stipulation of the Parties [Document #31] at ¶ 3).

In addition, with respect to Defendant's *per se* objection to any testimony by Plaintiff or Dr. McCloud because it was not contained in the "administrative record," the Court applied the Quesinberry standard, as reflected in the findings and conclusions below, in allowing only limited additional evidence to the extent it was necessary under the factors outlined by the Fourth Circuit. Specifically, the Court notes that Plaintiff's testimony did no more than describe the claims process and her submissions to AUL, and all of the information to which Plaintiff

8

testified was contained or reflected in the documents properly before the Court by stipulation of the parties. In addition, the testimony of Dr. McCloud was limited to his medical records, which were contained in AUL's administrative record, and to his medical qualifications and the scope of his medical license, for which there was "little or no evidentiary record" and which was necessary evidence for the Court in the "interpretation of the terms of the plan rather than specific historical facts" as outlined in <u>Quesinberry</u>. Therefore, Defendant's Motion in Limine to exclude this evidence at the bench trial was denied, and the Court allowed limited evidence as allowed under <u>Quesinberry</u>. Having addressed this evidentiary issue, the Court will now turn to a consideration of the appropriate findings of fact and conclusions of law in light of the relevant evidence.

II.     FINDINGS OF FACT

    Based on the Court's review of the evidence to which the parties have stipulated, as well as limited additional evidence presented during the bench trial as specifically noted, the Court makes the following findings of fact:

1.    Plaintiff was employed by Step One, Inc. ("Step One") beginning on January 27, 1999 as Head Nurse/Director of Nursing. Her job description included recruiting, scheduling and supervising other medical staff; administering medication; completing medical histories, assessments and evaluation for methadone admission; assisting the Medical Director with physical evaluations; monitoring supplies; providing medical education and counseling; conducting admissions for methadone treatment; maintaining records;

completion of information needed for client medical records; training of staff; HIV counseling and testing; and service as the Infection Control Officer for the organization. (American United Life Insurance Company Administrative Records Notebook [Document #21] (hereinafter "AUL") at 33). A form completed by the Executive Vice President of Step One noted that Plaintiff's job involved 15 minutes to 2½ hours per day of each of the following: bending or stooping, reaching above shoulder level, kneeling, balancing, lifting the usual number of pounds, lifting the maximum number of pounds, carrying the usual number of pounds, and carrying the maximum number of pounds. The position involved 4-5 hours per day sitting, 2-3 hours per day standing, 1 hour per day walking, and frequent manual dexterity. (AUL at 35).

2.      Step One maintained a long-term disability Plan (the "Plan") for its employees. This Plan was insured and administered by Defendant AUL. Plaintiff was a "person" under the Plan issued by AUL for Step One as a "participating unit." Under the Plan, Plaintiff was entitled to benefits during a period of "total disability" which was defined as: a period when "the Person cannot perform the material and substantial duties" of (1) her "regular occupation" for the first 24 months, or (2) "any gainful occupation" after benefits have been paid for 24 months. Plaintiff's claims in the present case relate to the first 24 months of benefit payments, and as such Plaintiff would have been considered totally disabled under the Plan if she could not perform the material and substantial duties of her regular occupation of Head Nurse/Director of Nursing. (AUL at 470-506). Once disability is

10

established under the Plan, "[t]he Monthly Benefit will be paid as long as Disability continues provided that proof of continued Disability is submitted to AUL upon request and the Person is under the regular attendance of a Physician." The Plan provides that the Monthly Benefit will cease if "the Person fails to give AUL required proof of Disability" or if "the Person is no longer under the regular and continuing care of a Physician." The Plan defines "Physician" as "a qualified, licensed doctor of medicine or osteopathy, and any other licensed health care provider that state law requires be recognized as a Physician, and practicing within the scope of his license. This does not include the Person, or the spouse, parent, son, daughter, brother or sister of the person." The Plan does not define "regular attendance," and does not further define when a Physician is "practicing within the scope of his license." The Plan does not confer discretion upon the plan administrator in making determinations under the Plan. (AUL at 470-506).

3.   In 2000, Plaintiff began experiencing neck and back pain and visited her primary care physician, R. Eberle, M.D. In office notes for October 18, 2000, Dr. Eberle noted that Plaintiff was suffering from neck pain, shoulder pain, leg pain, and numbness and tingling in her left hand. Dr. Eberle requested an MRI. (AUL at 120). Plaintiff's MRI revealed a central disc herniation at C5-6 with marked spinal stenosis and cervical myelopathy, and degenerative disc disease at the C4-5 level with central disc bulge and mild spinal stenosis. (AUL at 130). On December 14, 2000, William Brown, Jr., M.D., a neurological surgeon,

11

performed an anterior cervical corpectomy and fusion at the C5-6 level. At that time, Dr. Brown noted that Plaintiff was suffering from neck pain secondary to degenerative disc disease at C4-5, C5-6 and C6-7, as well as cervical stenosis with severe cord compression at C5-6. (AUL at 152-153).

4.    On January 9, 2001, Dr. Brown signed Plaintiff's "Physician's Statement" for AUL indicating that Plaintiff was disabled and unable to work from December 13, 2000 through February 15, 2001. (AUL at 3). Plaintiff's last day of work was December 13, 2000, and her salary was continued through January 31, 2001, after which she received short-term disability payments. (AUL at 1).

5.    On January 30, 2001, Dr. Brown saw Plaintiff for follow-up after her fusion surgery. She stated that her neck pain was the same but left arm pain was better. Dr. Brown recommended that Plaintiff return for a follow-up appointment in 2 months and stay out of work during that 2-month period. (AUL at 13). On April 3, 2001, Plaintiff saw Dr. Brown again. In his notes, Dr. Brown indicated that fusion was "progressing" at C4-5, 5-6, but that there was degenerative disc disease progression at C6-7. Dr. Brown indicated that Plaintiff should return for a follow-up appointment in 1 month, and should stay out of work during that 1 month period. Dr. Brown signed a note indicating that Plaintiff was being "evaluated and treated" in his office and should remain out of work from April 3, 2001 until May 21, 2001. (AUL at 11-12).

6.    On May 7, 2001, AUL Examiner Jeff Malaguerra reviewed Plaintiff's submissions and

concluded that Plaintiff "is currently restricted from doing [her] own occupation and should be approved benefits. Close follow-up with the claimant and Dr. Brown is needed to determine when the claimant is able to return to work. If the claimant continues to be kept off work, a job description from the employer and an updated APS from Dr. Brown will be needed." (AUL at 15-16). Plaintiff was informed of the approval by letter that day. (AUL at 17-18).

7.      On May 15, 2001, Plaintiff saw Dr. Brown again, and Dr. Brown noted that there was "good fusion C4-5, 5-6. Spondylosis at C6-7 (non-fused)." He further noted that Plaintiff had "neck pain and arm pain secondary to degenerative cervical disc disease C6-7." Thus, the fusion surgery apparently had good results at C4-5 and 5-6, but Plaintiff continued to suffer from pain related to degenerative disc disease at C6-7. Dr. Brown recommended that Plaintiff return for a follow-up appointment in two months and remain out of work during that 2 month period. (AUL at 28). A note from Dr. Brown further indicated that Plaintiff was "being evaluated and treated" in his office and "should remain out of work from May 15, 2001 until July 23, 2001." (AUL at 21).

8.      Plaintiff scheduled a follow-up appointment with her neurologist, Dr. Brown, for July 15, 2001, but due to a death in her family around that time, Plaintiff rescheduled that appointment for August 2001. (5/23/02 Letter, submitted pursuant to Stipulation on July 10, 2006 [Document #30] (hereinafter "5/23/02 Letter"); see also AUL at 422; AUL at 287). The August 2001 appointment was unexpectedly cancelled by Dr. Brown's office

13

due to emergency surgery in Dr. Brown's schedule. (5/23/02 Letter; AUL at 287). The appointment was ultimately rescheduled for November 19, 2001. (5/23/02 Letter). When the appointment was rescheduled, the November 19, 2001 appointment was the earliest appointment available due to Dr. Brown's schedule. (5/23/02 Letter; AUL at 66; AUL at 94). Dr. Brown's office continued to provide Plaintiff with prescription samples after the surgery and until he was able to see her again. (5/23/02 Letter).

9.     AUL undertook a review of Plaintiff's file in August 2001. On August 2, 2001, AUL Examiner Tim Thomas noted that Plaintiff's return to work in her own occupation "is very possible in the near future . . . This depends greatly on any changes that may occur in the next few months." Mr. Thomas also noted that "[a]t this time a goal is undeterminable as it appears the ct. has not achieved maximum medical improvement and we are still early in the claim." (AUL at 37). Included with Plaintiff's August 2001 long-term disability check was a request for supplemental information that Plaintiff did not return. (AUL at 168). On September 12, 2001, AUL sent a letter to Plaintiff informing her that her long term disability benefits were being suspended because she had not provided the required supplemental information. The letter also noted that if the information was not received within 21 days, her benefits could be permanently terminated. (AUL at 46). Plaintiff called AUL and requested a copy of the Supplemental Form that she was supposed to have completed. (5/23/02 Letter). According to a claims summary prepared by Mr. Thomas, Plaintiff insisted that she had not received this

14

request for information "until it was pointed out to her that they were attached to her checks." (AUL at 168). The Court finds that Plaintiff failed to complete the initial request for information because she did not realize that the request was attached to her August 2001 benefit check.

10.     AUL contacted Dr. Brown, Plaintiff's neurologist, in September and October of 2001 and someone in Dr. Brown's office told AUL that Plaintiff "was to have called back to their office and made a follow-up appointment before 7/23/01 but she never called back." (AUL at 168; see also AUL at 412, 415). The Court finds that AUL was thus initially given inaccurate information by Dr. Brown's office, since Plaintiff did, in fact, have an appointment scheduled for July 15, 2001, which was rescheduled for August 2001, which was then cancelled by Dr. Brown due to his surgery schedule and was later rescheduled for November 19, 2001. (See Finding of Fact #8). However, during a subsequent telephone conversation with Mr. Thomas, Plaintiff explained that her appointment with Dr. Brown could not be rescheduled until November 19, 2001. (5/23/02 Letter; AUL at 66). In addition, later in the claims process, an AUL representative spoke with Robbi at Dr. Brown's office, and confirmed that Plaintiff was supposed to return July 15 and could not, so the appointment was rescheduled. (AUL at 422). Moreover, Dr. Brown himself later sent a letter noting that "the length of time between her visits was due to problems in her own schedule (death in the family and illness), and emergency surgery in my schedule." (AUL at 287). Thus, AUL was ultimately aware that Plaintiff had

scheduled appointments with Dr. Brown in July and August 2001, which were then rescheduled by Dr. Brown's office for November 19, 2001 due to a death in Plaintiff's family and Dr. Brown's surgery schedule.

11.    On September 21, 2001, because Plaintiff could not get an appointment with Dr. Brown, her neurologist, until November 19, 2001, and because Mr. Thomas indicated to her that she needed to immediately provide supplemental medical information, Plaintiff saw Dr. Willard McCloud, M.D., her ophthalmologist, and he performed a general physical exam. In his records, Dr. McCloud noted that Plaintiff was "[u]nable to see neurologist until mid-November due to MD's schedule." Dr. McCloud noted that Plaintiff had extreme cervical and low back pain, and that the pain was constant and occurs with any activity such as sitting, standing, walking or lifting. (AUL at 94). Plaintiff had been a patient of Dr. McCloud's for many years. On June 8, 2001, Plaintiff had seen Dr. McCloud for a problem she was having with her eyes. During Plaintiff's visit on June 8, 2001, Dr. McCloud noted in his records that Plaintiff complained of pain in her cervical region and low back pain. During Dr. McCloud's examination of Plaintiff, he noted that he had "difficulty . . . in placement for examination due to limited range of motion in cervical area and patient is still in Aspen collar." (AUL at 95). During the subsequent visit on September 21, 2001, Dr. McCloud noted that Plaintiff's pain had not improved since her last visit, that she had numbness, tingling, and leg cramps on her left side, that she had decreased grip strength and was unable to hold objects for an extended time, and that pain

was increased on rising from sitting, bending, turning and walking. Dr. McCloud reviewed Plaintiff's x-rays and noted that Plaintiff suffered from chronic back pain and incomplete fusion. (AUL at 94). Based on this examination, Dr. McCloud completed a Supplemental Physicians Statement indicating that Plaintiff suffered from a total disability from July 1, 2001 through September 2001 with severe functional limitations. (AUL at 7).

12.     Dr. McCloud is a medical doctor who has been licensed to practice medicine in North Carolina since 1981, and currently specializes in diseases of the eye. Dr. McCloud has a general license to practice medicine and is not board-certified in any specialties, but during his career he has worked in various capacities, including serving as Chief of Surgery and Chief of Staff at a hospital in Newport News, Virginia. He now works primarily as an ophthalmologist, although as part of his practice he sees patients with various complaints and for various problems. (Testimony of Dr. McCloud on July 10, 2006).

13.     Plaintiff continued during this time to speak with Mr. Thomas at AUL regarding her claim. Plaintiff explained to Mr. Thomas that her appointment with Dr. Brown could not be rescheduled until November 19, 2001, and Mr. Thomas told her that "another physician aware of [her] condition could sign the form, due to the imposed deadline . . . as long as it was a 'licensed medical doctor.'" (5/23/02 Letter; see also AUL at 66). She told Mr. Thomas that she "had seen [her] ophthalmologist, Dr. McCloud as [she] had not

been able to get an appointment with [her] primary care physician for over three weeks and that by then it would be about the time of the scheduled appointment with Dr. Brown." (5/23/02 Letter). Mr. Thomas told her "to send a copy of the office visit and the supplemental form." (5/23/02 Letter; see also AUL at 66). Plaintiff later noted that "it was Mr. Thomas who granted permission for Dr. McCloud to complete the necessary paperwork." (5/23/02 Letter). Defendant did not present any evidence or argument to contradict Plaintiff's statement that Mr. Thomas gave her permission to see Dr. McCloud in the interim while she waited for her appointment with Dr. Brown, other than the fact that Mr. Thomas did not document the conversation one way or the other in his file notes. Based on this evidence, the Court finds that Mr. Thomas authorized Plaintiff to see Dr. McCloud in the interim while she was waiting for her scheduled appointment with Dr. Brown.

14.     On October 12, 2001, AUL sent a letter to Plaintiff indicating that it would not consider Dr. McCloud qualified to evaluate her cervical condition if he was "a practicing optometrist, ophthalmologist or related specialty." The letter from AUL requested that Plaintiff submit a statement by a physician qualified to treat her cervical condition within 21 days. (AUL at 216-218). In his claim summary, Mr. Thomas noted that Dr. McCloud was an ophthalmologist "who was in all likelihood [sic] practicing outside the scope of his license." (AUL at 168). However, nothing in the record indicates that AUL requested or obtained any opinion from any doctor or other medical professional regarding this

18

determination. In fact, during a later medical review, AUL's reviewing nurse specifically noted that she was "unsure if the treatment by the ophthalmologist would count as under regular care and attendance." (AUL at 165). Based on the evidence presented in the administrative record, this was the only information that AUL relied upon in making its determination regarding Dr. McCloud.

15.    On November 5, 2001, Plaintiff sent a letter to AUL stating again that the first available appointment with Dr. Brown was the appointment she had scheduled in November 2001, and that she saw Dr. McCloud in the interim "as per instruction." (AUL at 66). Plaintiff's letter noted that Dr. McCloud had treated her for many years, that he had a license to practice medicine in North Carolina and that AUL erred in its assessment of Dr. McCloud because AUL had no knowledge of Dr. McCloud's previous experience.

16.    According to Mr. Thomas' claim summary, Plaintiff told him on November 14, 2001 that she had not seen Dr. Brown for financial reasons and was instead seeing Dr. McCloud because he was a friend. (AUL at 169, 417-418). However, this characterization is not consistent with the written explanations Plaintiff provided in her previous letters, as well as the notation in Dr. McCloud's medical notes on September 21, 2001, that Plaintiff was unable to obtain an immediate appointment with Dr. Brown due to Dr. Brown's schedule, and Dr. Brown's subsequent letter indicating that the time between visits was due to his surgery schedule. (AUL at 94; AUL at 287). In addition, in her later letters, Plaintiff noted that "[i]t was Mr. Thomas who deemed Dr. McCloud a 'family friend.'"

(5/23/02 Letter). Therefore, the Court finds that Mr. Thomas' claim summary does not accurately summarize the information provided by Plaintiff regarding her reasons for seeing Dr. McCloud.

17. On November 19, 2001, Plaintiff had the flu and was unable to keep her appointment with Dr. Brown, and it was rescheduled for December 19, 2001. (5/23/02 Letter). Plaintiff spoke with Mr. Thomas at AUL on November 19, 2001, to inform him of the rescheduling. (5/23/02 Letter).

18. On December 11, 2001, Plaintiff sent a letter to Mr. Thomas at AUL informing him that she had applied for Social Security benefits, and further informing him that the appointment with her neurologist could not be rescheduled until December 19, 2001. (AUL at 69).

19. On December 18, 2001, cervical x-rays were taken showing "continuing fusion from C4 through C6 with stable mid cervical kyphosis. DDD at C6-7, unchanged. There is foraminal encroachment by spurs bilaterally at C4-5, C5-6, and C6-7." (AUL at 100). The next day, on December 19, 2001, Plaintiff saw Dr. Brown, who indicated that Plaintiff presented with neck pain, left arm pain, and back pain. Dr. Brown noted a partial fusion at C4-5 and C5-6 with an increase in degeneration at C6-7, neck and arm pain secondary to degenerative disc disease at C6-7, and Plaintiff's back and leg pain secondary to lumbar negative disc disease at L5-S1. Dr. Brown indicated that Plaintiff should stay out of work indefinitely. Dr. Brown also noted the possibility of future

20

fusion surgery based on Plaintiff's condition, including surgery to reinforce the fusion at C4-5, 5-6. (AUL at 70-71). On December 26, 2001, Dr. Brown signed a Supplemental Physician's Statement noting an increase in degeneration and decrease in disc space, requiring Plaintiff to stay out of work indefinitely, and stating that Plaintiff was totally disabled "From December 19, 2001 Through indefinitely." (AUL at 9). All of these records were provided to AUL.

20.    On January 14, 2002, Plaintiff saw Dr. McCloud again, who noted in his records that Plaintiff had seen Dr. Brown in December. Dr. McCloud noted that Plaintiff's pain and other symptoms remained essentially unchanged, and that extreme pain in her cervical region and back continued. Dr. McCloud noted that Plaintiff was wearing a back brace and continued to use an Aspen collar. Dr. McCloud also noted that his review of her December 18, 2001 x-rays indicated incomplete fusion and cervical vertebrae spurs, which was probably causing the extreme pain. Dr. McCloud also noted that her condition was probably progressive, and that the same problems were occurring in her back. (AUL at 93).

21.    Nevertheless, on January 14, 2002, an AUL representative spoke with Plaintiff and informed her that "[m]edical records from Dr. Brown indicated release to RTW on July 23." (AUL at 422). The AUL representative further indicated that the records from Dr. Brown on December 19, 2001 would indicate a new period of disability. However, the Court notes that Dr. Brown had not signed any forms or made any statement or finding

indicating that Plaintiff was released to return to work, and Dr. Brown's office specifically informed AUL in October 2001 that Dr. Brown had not released Plaintiff to return to work. (AUL at 168; AUL at 415). Telephone logs from AUL also indicate that "Per conversation documented - Paula at Dr. Brown's office said that Dr. Brown did not release Ms. Richardson to rtw." (AUL at 426).

22. On January 18, 2002, Plaintiff sent a letter to Claims Representative Tina Jones at AUL noting that she had contacted Dr. Brown's nurse, Paula, regarding AUL's contentions. Plaintiff stated that Dr. Brown told her that her condition was progressive. Plaintiff also indicated that Paula at Dr. Brown's office told Plaintiff that her form should have been dated to cover the time between her visits. Plaintiff indicated that she had notified Dr. Brown's office when she was unable to keep scheduled appointments, and that the reasons had been noted by Dr. Brown's staff. (AUL at 73).

23. On January 22, 2002, Dr. Brown completed a form indicating that Plaintiff was being evaluated and treated in his office and should remain out of work during the period from July 23, 2001 until December 19, 2001. (AUL at 75). On January 31, 2002, Dr. Brown signed a note indicating that Plaintiff was being "evaluated and treated in our office" and should remain out of work from December 19, 2001 until "indefinitely." (AUL at 86).

24. On January 23, 2002, Plaintiff sent a letter to AUL noting that she did not have any "new spell of illness" and that AUL had failed to allow for her physician's extended schedule and her right to seek other medical assistance with her condition. (AUL at 76).

25.   On February 5, 2002, Mr. Thomas verbally told Plaintiff that her claim had been denied, but later stated that he was "awaiting further information." (5/23/02 Letter). Plaintiff had several telephone conversations with AUL during this time, and explained to Mr. Thomas that she was still receiving treatment from Dr. McCloud and Dr. Brown, that she saw Dr. McCloud every two (2) months and saw Dr. Brown every four (4) to six (6) months, and that she had provided all of the records from Dr. Brown, including the records for her visit in December 2001. (AUL at 401).

26.   On February 8, 2002, AUL representative Tina Jones told AUL examiner Tim Thomas "per her conversation with Dr. Brown that [Plaintiff's] fusion still has not completely healed." (AUL at 170). Ms. Jones called Plaintiff to let Plaintiff know that they would "be releasing benefits through 1/13/02" but would "need copies of the xrays performed and current medical information." (AUL at 426). Ms. Jones told Plaintiff that a check would be mailed on February 11, 2002 for benefits from September 12, 2001 through January 13, 2002, and that further benefits would be "authorized upon receipt of the X-ray report." (5/23/03 Letter; see also AUL at 426). In a note to Tim Thomas, Ms. Jones indicated that she had released payments to Plaintiff and that "[w]e will need current medical records and copies of all x-ray reports (actual reports from radiology) in order to consider additional benefits." (AUL at 97). Ms. Jones followed-up with a letter to Plaintiff stating that Plaintiff's benefits were retroactively reinstated while her claims review was ongoing. The letter indicated that AUL was requesting all x-ray reports and

23

current medical records for review. (AUL at 87-88). On February 8, 2002, Plaintiff sent a letter to Ms. Jones enclosing the x-ray report requested by Ms. Jones. (AUL at 89). As noted above, the x-ray report showed "continuing fusion from C4 through C6 with stable mid cervical kyphosis. DDD at C6-7, unchanged. There is foraminal encroachment by spurs bilaterally at C4-5, C5-6, and C6-7." (AUL at 100). Plaintiff was paid benefits through January 13, 2002.

27. On March 25, 2002, Plaintiff sent a letter to AUL noting that she had not received any notice yet regarding her benefits determination, and noting that all information requested by AUL had been provided. (AUL at 247). On April 24, 2002, Plaintiff sent another letter to AUL noting that she had not received any benefits since February 2002, and that she had not received a timely response regarding future payments. (AUL at 141).

28. On April 11, 2002, Plaintiff saw Robert A. Eberle, MD, her primary care physician, for hypertension. Dr. Eberle noted that Plaintiff had chronic neck and back pain and was under the care of Dr. Brown. Dr. Eberle noted that Dr. Brown was considering further surgery. (AUL at 118).

29. On May 17, 2002, Mr. Thomas sent a letter to Plaintiff noting the lack of objective medical evidence to support her claim and the unacceptability of some records received. The letter noted that Plaintiff's file would be sent to AUL's medical review department for review of Plaintiff's claim. (AUL at 154).

30. On May 20, 2002, Plaintiff's medical records and claim information were forwarded to

24

AUL's Registered Nurse Medical Consultant for review. (AUL at 157-66). In the referral notice, Mr. Thomas noted that "objective findings have not seemed serious" and "CT was receiving TX from an opthamologist [sic] in addition to regular TX sources (Drs. Brown & Eberle)." Mr. Thomas asked the RN Medical Consultant, Registered Nurse Karen Oxford, to evaluate whether objective medical evidence supported the impairment, whether Plaintiff was receiving regular care and attendance by a physician, and Plaintiff's return to work prognosis to her regular occupation of head nurse. (AUL at 156). During the period between May 20, 2002 and May 27, 2002, Nurse Oxford reviewed Plaintiff's medical records and prepared an "RN Medical Consultant Referral Response." Nurse Oxford reviewed all of Plaintiff's records from Dr. Eberle, Dr. Brown and Dr. McCloud. (AUL at 157-165). In reviewing Dr. Brown's records from May 15, 2001, Nurse Brown noted that "[f]or some unknown reason, the patient did not see Dr. Brown again until 12/19/01." Nurse Brown further noted that "[h]owever, the patient did see Dr. McCloud, her ophthalmologist on 06/01/01 and 09/21/01 and the ophthalmologist did direct notes, care and treatment of her neck pain." (AUL at 165). **Based on her review, AUL Nurse Karen Oxford concluded that "it appears that there is objective medical evidence to support impairment from her sedentary job of Head Nurse,** especially if there was a lot of computer usage. I am unsure if the treatment by the ophthalmologist would count as under regular care and attendance. If not, the patient did not see Dr. Brown from 05/15/01-12/19/01. Restrictions and limitations would most likely be

reaching overhead, computer keyboarding, repetitive movements of hands, wrists, arms, head and shoulders." (AUL at 166 (emphasis added)). AUL Nurse Karen Oxford further concluded that any return to work prognosis depended upon whether additional surgery was performed, and also depended upon "patient's pain level as DDD/spondylosis is progressive and she has foraminal encroachment by spurs bilaterally at C4-5, C5-6, C6-7. Patient's complaints before and after surgery of 2nd, 3rd, 4th, and 5th digit are consistent with C7-C8 spinal nerve pathway encroachment." (AUL at 166).

31.     On June 6, 2002, Mr. Thomas prepared a memo to Plaintiff's file summarizing an internal management discussion of Plaintiff's claim. According to the memo, it was determined that Plaintiff's claim should be denied because Dr. Brown "advised the ct was capable of RTW by 07/23/01" and because when Dr. McCloud was "treating her for her cervical spine problems he is not practicing within the scope of his license." According to the memo, "the ct would not be considered disabled from her own occupation after 7/23/01 . . . due to the lack of [objective medical evidence] to prove this." Finally, the memo noted that the December 18, 2001 X-ray and visit to Dr. Brown "should be considered to be constituting a new period of disability. **This is in spite of the fact that the condition has not changed.**" (AUL at 175 (emphasis added)). AUL thus determined that Plaintiff's condition had not changed, but that she should nevertheless be considered to have a "new disability" due to the 7-month "gap" between visits to Dr. Brown and the fact that her treatment in the interim was by an ophthalmologist. AUL also based its conclusion on

26

the fact that Dr. Brown purportedly advised that Plaintiff was capable of returning to work by 7/23/01, although AUL was aware that, in fact, Dr. Brown's office had actually advised that Dr. Brown had not released Plaintiff to return to work. (See Finding of Fact #21). In addition, there is no reference in Mr. Thomas' memo to Nurse Oxford's conclusion that there actually was objective medical evidence to support Plaintiff's claim. Nor is there any reference to Nurse Oxford's statement that she was "unsure if the treatment by the ophthalmologist would count as under regular care and attendance," but that "the ophthalmologist did direct notes, care and treatment of her neck pain." Without obtaining any additional opinion or review regarding the scope of Dr. McCloud's license, AUL determined that Dr. McCloud's records and treatment would not be considered at all based on AUL's determination that he was practicing outside the scope of his license. (AUL at 175).

32.     On June 9, 2002, Plaintiff sent a letter to AUL requesting a copy of her policy and her claim file. (AUL at 179). On June 14, 2002, Plaintiff sent a letter to AUL requesting a notification of the status of her disability claim. (AUL at 181).

33.     On June 11, 2002, the Indiana Department of Insurance sent a letter to AUL requesting information regarding Plaintiff's claim, based on a complaint filed by Plaintiff with the Department of Insurance. (AUL at 182-187).

34.     On June 18, 2002, AUL sent Plaintiff a letter summarizing its review and concluding that: (1) there was no objective medical evidence to support Plaintiff's total disability beyond

July 23, 2001; (2) there was no documentation that Plaintiff had been under the "regular care of a Physician" for the period from July 23, 2001 through December 19, 2001; and (3) records and treatment by Dr. McCloud would not be considered because he was "practicing outside the scope of his license." AUL indicated that any disability reflected in the December 18, 2001 x-rays would be considered a new period of disability, and that her group coverage under the policy therefore ceased as of July 23, 2001. In the letter, AUL specifically determined that "July 23, 2001 is the date AUL considers your disability to have ceased. Both a written Job Description and conversations with your employer indicate that your position as Head Nurse or Director of Nursing would be considered only sedentary in nature. Your duties with your prior employer would not be considered to have been as strenuous as those in a typical hospital or other facility. Therefore, AUL does believe at that time you were capable of returning to your prior job as Head Nurse either with your prior employer or at another similar facility." The letter states that "[t]here is no indication that you were unable to return to your duties as Head Nurse after the reported anticipated return to work date of July 23, 2001." The letter also specifically noted that any records from Dr. McCloud were "not deemed to be acceptable" because "Dr. McCloud is a practicing Ophthalmologist and, with respect to your particular physical concerns, he would be considered to be practicing outside the 'scope of his license.'" The letter concedes that "information was later obtained, but there is a lack of continuous care for your impairment after July 23, 2001." The letter noted

28

that the December 18, 2001 X-rays constituted "a new period of disability due to the aforementioned lack of medical evidence immediately following July 23, 2001." Finally, the letter noted that "even if the above mentioned 'gap' in your disability did not exist, and you had received treatment from a doctor practicing within the 'scope of his license,' the issue would still exist as to whether you were capable of performing your past job. The above-mentioned medical evidence and Job Description do seem to indicate that you were fully capable of doing so as of July 24, 2001." (AUL at 190-197). However, AUL did not provide any medical evaluation or determination in this regard, particularly in light of the fact that their reviewing nurse had concluded that, in fact, "it appears that there is objective medical evidence to support impairment from her sedentary job of Head Nurse." (AUL at 166).

35.    On October 22, 2002 and December 12, 2002, Plaintiff, with the assistance of counsel, appealed the decision to terminate her benefits. During the appeal process, Plaintiff submitted a letter from Dr. Brown dated November 19, 2002, stating that "I have reviewed all my records on Ms. Richardson and it is my opinion that Ms. Richardson was not able to perform the job that you included in your letter of 11/13/02 [attaching Ms. Richardson's job description]. Specifically, that she was not able to work during that time [from July 23, 2001 through December 19, 2001]. Moreover, the length of time between her visits was due to problems in her own schedule (death in the family and illness), and emergency surgery in my schedule." (AUL at 287).

36.    On January 14, 2003, Dr. Brown examined Plaintiff again and noted that she suffered from degenerative disc disease beginning December 14, 2000, and that she "is not fit for any duty, out of work until . . . Indefinite." (1/14/03 Evaluation by Dr. Brown, submitted pursuant to Stipulation on July 10, 2006 [Document #30]).

37.    In an appeal letter to AUL dated February 13, 2003, Plaintiff's attorney noted that with respect to any alleged "gap" in treatment, "[i][f a gap exists in my client's treatment by Dr. Brown it is only because of extenuating circumstances as described by Dr. Brown in his November 19, 2002 letter. My client should not be deemed able to work and denied her LTD benefits by only inferring such from the length of time between her visits with Dr. Brown. This is especially true since Dr. Brown explains the length of time as being due to death in my client's family, and illness of my client, and Dr. Brown's own scheduling conflicts. It is abundantly clear that Dr. Brown did not intend for my client to return to work on July 24, 2001 as shown in his November 19, 2002 letter. AUL has no evidence that Dr. Brown intended any return to work by my client between July 23, 2001 through December 19, 2001. Furthermore, I cannot think of a more objective case for disability than my client's in that she had neck surgery in December 2000." (AUL at 339). The letter also noted that Plaintiff "obtained permission from an AUL employee to see someone other than Dr. Brown in order to be evaluated for ongoing disability between July 23, 2001 and December 19, 2001 which she did (Dr. McCloud)." (AUL at 339). The letter also requested an explanation as to how the determination was made that a medical

30

doctor was practicing outside the scope of his license.  (AUL at 340).

38.     On April 7, 2003, Plaintiff's claim for Social Security disability benefits was approved. (AUL at 355).  Plaintiff's claim had initially been denied because, although the Social Security Administration found that her condition kept her from doing any of her past jobs, it initially found that her condition would not keep her from doing less demanding work.  (AUL at 330).  However, the Social Security Administration Administrative Law Judge subsequently concluded that Plaintiff had been disabled since December 14, 2000 based on her degenerative disc disease of the lumbar and cervical spine, status post fusion, and that Plaintiff was "unable to do sustained work activities in an ordinary work setting on a regular and continuing basis."  (AUL at 358-59).  In support of this determination, the Administrative Law Judge noted Plaintiff's "[o]n going treatment with Dr. Brown, neurosurgeon" for degenerative cervical disc disease, and Dr. Brown's findings and limitations as Plaintiff's treating physician.  (AUL at 359).

39.     On May 13, 2003, AUL denied Plaintiff's appeal.  In response to Plaintiff's appeal, AUL referred to its prior determination and further stated simply that "[a]s a practicing ophthalmologist, Dr. McCloud's treatment of Ms. Richardson's alleged disabling condition would be considered practicing outside the scope of his license."  (AUL at 344).

40.     On November 6, 2003, Plaintiff filed a second appeal.  Included in this appeal was a letter from Dr. McCloud stating that he was able to treat Plaintiff's neck and back problems because he is a licensed medical doctor in North Carolina with no restrictions on his

31

license to practice medicine. The appeal also included the decision dated April 7, 2003 approving Plaintiff's application for Social Security Disability benefits. (AUL at 363-75). AUL forwarded Plaintiff's appeal to a consultant for review. The consultant, ClaimSourceDM, found no objective medical evidence of total disability and no continuous care for the disabling condition after May 15, 2001. However, this determination was made by a claims administrator, and there is no indication of whether any medical personnel reviewed Plaintiff's claim or participated in this determination. (AUL at 384-89). There was also no reference to AUL Nurse Karen Oxford's prior determination that "it appears that there is objective medical evidence to support impairment from her sedentary job of Head Nurse." (AUL at 165).

41. On February 18, 2004, AUL denied Plaintiff's second appeal. AUL indicated again that there was no objective medical evidence to support a finding of disability beyond July 23, 2001, that there was no evidence of continuing care by a Physician after May 15, 2001, that Dr. McCloud was not qualified "within the accepted medical protocol" to assess her neurological impairments and his treatment of Plaintiff "would be considered practicing outside the scope of his license," and that even if Dr. McCloud's records were considered, they did not provide objective medical evidence of impairment. (AUL at 390-97). Based on these findings, AUL concluded that Plaintiff did not satisfy the definition of total disability and was not under the continuous care of a legally qualified physician. (AUL at 395). Plaintiff did not receive any benefit payments after January 13, 2002.

32

42.   Plaintiff filed the present suit pursuant to ERISA, 29 U.S.C. § 1001 *et seq.*, contending that AUL wrongfully denied disability benefits recoverable under the terms and provisions of the Plan.

III.   CONCLUSIONS OF LAW

1.   This matter is properly before the Court, sitting as the trier of fact, for trial on the merits. Plaintiff is a plan beneficiary seeking payment of benefits under an employer-sponsored benefit plan pursuant to 29 U.S.C. § 1132(a)(1)(B). Defendant is a plan administrator of an employer sponsored benefits plan within the purview of ERISA, 29 U.S.C. § 1001 *et seq.*

2.   This matter is before the Court to review Defendant's denial of Plaintiff's claim for disability benefits under the Plan. The standard of review is *de novo*, since the parties stipulate that the Plan does not grant discretionary authority to the plan administrator to determine eligibility for benefits or construe the terms of the Plan. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).

3.   In reviewing the plan administrator's decision, the Court has considered the Administrative Record presented by AUL, as well as the additional documents which the parties have stipulated are properly before the Court for consideration. The Court also considered the testimony at the bench trial in this case of Dr. McCloud with respect to his qualifications and the scope of his license to practice medicine, since those were matters for which there was "little or no evidentiary record" and which was necessary

33

evidence for the Court in the "interpretation of the terms of the plan rather than specific historical facts" as outlined in <u>Quesinberry v. Life Ins. Co. of North America</u>, 987 F.2d 1017, 1026-27 (4th Cir. 1993).

4.  With respect first to Defendant's determination that records and treatment by Dr. McCloud should not be considered because Dr. McCloud was "practicing outside the scope of his license," the Court concludes to the contrary and finds that Dr. McCloud was not practicing outside the scope of his license because he is a physician with an unrestricted license to practice medicine in North Carolina. North Carolina General Statutes §§ 90-9 through 90-11 outline the qualifications and examinations required to obtain a medical license from the North Carolina Medical Board. A license to practice medicine in North Carolina is not limited to any particular speciality and does not include any limitation as to the type of practice a doctor may pursue within the scope of his general license to practice medicine. Defendant has presented no evidence, basis or medical opinion supporting its conclusion that a physician with a license to practice medicine who also specializes in a certain area acts outside the scope of his license if he treats a patient for any condition outside his specialty. To the extent Defendant now contends that Dr. McCloud was acting outside of "accepted medical protocol," Defendant has presented no evidence or expert testimony to establish "accepted medical protocol," nor is any such phrase included in the Plan language itself. Therefore, after considering the evidence presented, the Court finds that Dr. McCloud was not "practicing outside the

34

scope of his license" under the terms of the Plan when he treated Plaintiff for her back and neck pain. The Court further concludes that under the terms of the Plan, Dr. McCloud was a "Physician" because he was "a licensed doctor of medicine" under North Carolina law and was "practicing within the scope of his license." The fact that Dr. McCloud was not a specialist in back and neck pain may be considered in determining the weight to give his evaluation and treatment, but there is no basis under the Plan language to support excluding all consideration of Dr. McCloud's treatment and evaluation of Plaintiff. Therefore, the Court concludes that the evaluation and treatment by Dr. McCloud may be considered and given appropriate weight in determining Plaintiff's entitlement to benefits under the Plan.

5.     With respect to Defendant's determination that there was no objective medical evidence to support Plaintiff's total disability beyond July 23, 2001, the Court concludes that, in fact, there was objective medical evidence to support Plaintiff's total disability, including multiple x-rays that revealed significant degenerative disc disease continuing after Plaintiff underwent fusion surgery, and there is no evidence or medical opinion to the contrary. In this regard, the Court notes that although AUL contends that Dr. Brown released Plaintiff to work as of July 23, 2001, the Court found above that Dr. Brown did not ever release Plaintiff to return to work, and his office specifically informed AUL in October 2001 that Plaintiff had not been released to return to work. In addition, Dr. Brown subsequently confirmed that in his opinion, Plaintiff was disabled and unable to work

during the period from July 23, 2001 through December 19, 2001, and thereafter indefinitely. Defendant did not obtain any evidence or opinion disputing this conclusion or finding that Plaintiff was able to work. In fact, and of significant importance in this case, AUL's own medical examiner reviewed Plaintiff's x-rays and medical records and determined in May 2002 that "it appears that there is objective medical evidence to support impairment from her sedentary job of Head Nurse." This conclusion is further supported by the fact that Plaintiff's condition is progressive, resulting in continued degeneration, not improvement, over time. Nothing in Plaintiff's medical records or x-rays establishes that Plaintiff's condition improved or was improving between July 2001 and December 2001, and there is simply no evidence at all that Plaintiff was capable of returning to work after July 23, 2001. In fact, AUL representative Tina Jones spoke with Dr. Brown's office in February of 2002, and was informed that at that time, Plaintiff's "fusion still has not completely healed." In his internal memo, AUL representative Tim Thomas found that Plaintiff's condition had not changed during that time, but nevertheless concluded that Plaintiff "would not be considered disabled from her own occupation after 7/23/01" and would be experiencing a new period of disability "in spite of the fact that the condition has not changed." Defendant's determination in this regard appears to have been based solely on the fact that Plaintiff's follow-up appointment with Dr. Brown was rescheduled several times, initially leaving a "gap" in the "out of work" notes provided by Dr. Brown, which was later addressed and "filled in" by Dr. Brown

36

after Plaintiff was able to return to see Dr. Brown in December 2001. However, as noted above, every medical professional who saw Plaintiff or reviewed her records and x-rays, including Dr. Brown, Dr. McCloud, and AUL's own medical examiner, Nurse Karen Oxford, all determined that Plaintiff was unable to return to work and that there was objective medical evidence supporting a finding of disability. The Social Security Administration likewise determined that Plaintiff was, in fact, disabled for all of the relevant time period. There is simply no evidence or medical opinion or conclusion to the contrary. In light of all of this evidence, the Court concludes that Plaintiff was and is totally disabled under the terms of the Plan, including during the period from July 23, 2001 through December 19, 2001.

6.     With respect to Defendant's determination that there was no documentation that Plaintiff had been under the "regular care of a Physician" for the period from July 23, 2001 through December 19, 2001, the Court concludes that Plaintiff was, in fact, under the regular care of Dr. Brown during this time, even though she experienced some delay in rescheduling her appointment. Plaintiff was in contact with Dr. Brown's office during this time, was receiving medications and prescription samples from him, and had appointments scheduled in July 2001, August 2001 and November 2001, which were rescheduled due to extenuating circumstances, including Dr. Brown's surgery schedule. Dr. Brown considered Plaintiff to still be under his care and treatment, and sent AUL a note in January 2002 indicating that Plaintiff was being evaluated and treated by his office

during the period from July 2001 through December 2001, even though there was some delay in rescheduling her appointments. Defendant has not presented any evidence, medical opinion, or basis supporting its conclusion that Plaintiff was not under Dr. Brown's care during this time, given these circumstances. In addition, no provision of the Plan further defines "regular care" or requires appointments at any certain frequency. Therefore, given the evidence presented, and particularly in light of Dr. Brown's assertion that Plaintiff was under his care during this time frame, and the lack of evidence by Defendant to the contrary, the Court concludes that Plaintiff was under the regular care and attendance of Dr. Brown for all of 2001.

7. The Court further concludes that Plaintiff undertook every reasonable effort to submit proof of her continued disability upon request, including making an appointment to see Dr. Brown, who ultimately provided proof of Plaintiff's continued disability. In addition, Plaintiff provided AUL with ongoing information regarding her efforts to reschedule her appointment with Dr. Brown, and even went to see Dr. McCloud in the interim to obtain immediate information for AUL, with the permission of AUL to do so, while she was waiting for her rescheduled appointment with Dr. Brown. Dr. McCloud's examination provides further evidence that Plaintiff continued to suffer disabling degenerative disc disease during the period from July 2001 through December 2001, and the Court finds that Plaintiff met her obligation to provide "proof of continued Disability . . . to AUL upon request."

8.   In light of these findings and conclusions, the Court ultimately concludes that Defendant's determination to deny Plaintiff's claim for benefits was erroneous and will be reversed.

9.   As a result of Defendant's wrongful denial of benefits, Plaintiff is entitled to benefits due under the Plan since January 13, 2002.  In addition, the Court in its discretion, in light of the equitable nature of this action and in order to make Plaintiff whole, will also award pre-judgment interest at the rate of eight percent (8%) per annum, which is the applicable state rate under North Carolina law. See N.C. Gen. Stat. § 24-1; Quesinberry, 987 F.2d at 1030-31 (holding that an award of pre-judgment interest in an ERISA case is discretionary with the trial court, and upholding a district court's use of the applicable state rate).  Moreover, Plaintiff is also entitled to future benefits to the extent she continues to qualify under the terms of the Plan.

10.  The Court further concludes that Defendant acted without any substantial basis in denying Plaintiff's claim, that Defendant is able to pay an award of fees and costs, and that an award of fees and costs against Defendant would deter others from acting as Defendant did in this case.  Therefore, and in light of the relative merits of the parties' positions, the Court concludes that Plaintiff is entitled to Judgment against Defendant for costs and expenses incurred in this action as well as reasonable attorney's fees.

IV.   CONCLUSION

Having reviewed and considered the administrative record and the arguments presented

by the parties, the Court concludes that Plaintiff has established that Defendant's decision to discontinue her disability benefits was erroneous under the terms of the Plan and in light of the evidence presented. The Court will therefore enter Judgment in favor of Plaintiff. The Court will award Plaintiff the total amount of disability benefits due her, plus pre-judgment interest at the rate of eight percent (8%) per annum. Additionally, the costs of this action will be taxed against Defendant, including an award of reasonable attorney's fees. In this regard, the Court will order Plaintiff to submit an affidavit to the Court within ten (10) days of the date of this Order and Judgment outlining and calculating benefits, interest, costs and attorney's fees owed in light of the Court's Judgment. Defendant will be given ten (10) days from the filing of the affidavit to raise any objections to Plaintiff's calculation of damages, and any such objections should include Defendant's proposed alternative calculations in light of the Court's Judgment.

An Order and Judgment consistent with these Findings and Conclusions will be entered contemporaneously herewith.

This, the 15th day of November, 2006.

James A. Beaty

United States District Judge